**MAINE HUMAN RIGHTS COMMISSION, for the Use of Aurora KELLMAN**

v.

**DEPARTMENT OF CORRECTIONS.**

Supreme Judicial Court of Maine.

Argued March 17, 1983.

Decided April 11, 1984.

Wheeler, Arey & Millett, P.A., William J. Kelleher (orally), Waterville, for plaintiff.

Preti, Flaherty & Beliveau, Christopher D. Nyhan (orally), Portland, for defendant.

Before McKUSICK, C.J., and GODFREY,[*] NICHOLS, CARTER,[**] VIOLETTE and WATHEN, JJ.

VIOLETTE, Justice.

The plaintiff Maine Human Rights Commission, on behalf of Aurora Kellman, brought an action in the Superior Court, Kennebec County,[1] alleging the defendant Department of Corrections [2] unlawfully discriminated against Ms. Kellman because of her age and sex, in violation of 5 M.R.S.A. § 4572(1)(A),[3] in hiring persons for the position of Juvenile Court Intake Worker (JCIW). After hearing the evidence, the Superior Court analyzed it according to the three-step methodology described by this court in *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253 (Me.1979) (*Auburn I*), and concluded the plaintiff had failed to make a *prima facie* showing that the defendant's selection process had a "disparate impact" on females and persons over forty, but concluded the plaintiff had shown Aurora Kellman suf-

---

[*] GODFREY, J., sat at oral argument and participated in the initial conference, but retired prior to the adoption of this opinion.

[**] CARTER, J. sat at oral argument and participated in the initial conference, but resigned prior to the adoption of this opinion.

1. 5 M.R.S.A. § 4612(4) (1979) authorizes the Commission to file such civil actions in the Superior Court, "seeking such relief as is appropriate."

2. At the time of the Superior Court hearing, the defendant was the Department of Mental Health and Corrections. In accord with the Legislature's establishment of a separate Department of Corrections, effective January 15, 1984, we have changed the name of the party-defendant. 34-A M.R.S.A. § 1202 (Supp.Pamph.1983–1984).

3. 5 M.R.S.A. § 4572(1)(A) (1979) provides:
§ 4572. Unlawful employment discrimination

1. Unlawful employment. It shall be unlawful employment discrimination, in violation of this Act, except where based on a bona fide occupational qualification:
A. For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, physical or mental handicap, religion, ancestry or national origin or age, or because of any such reason to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment, or in recruiting of individuals for employment or in hiring them, to utilize any employment agency which such employer knows, or has reasonable cause to know, discriminates against individuals because of their race or color, sex, physical or mental handicap, religion, age, ancestry or national origin....

fered "disparate treatment" from facially neutral hiring practices.[4] Equitable remedies ordered by the court included instatement of Aurora Kellman, an award of back pay (reduced by one-half because of Ms. Kellman's failure to mitigate her damages), penal damages imposed against the defendant, and alterations of the defendant's employee selection process.

On appeal, the defendant contests the court's conclusion concerning disparate treatment of Aurora Kellman, and objects to the remedies imposed by the court. We agree with the defendant that the court committed error in its finding of disparate treatment. We vacate the judgment on that issue and remand to the Superior Court. On a cross appeal, the plaintiff argues the court's conclusion regarding disparate impact was erroneous, and objects to the limitations imposed on Ms. Kellman's back pay award. We find no error in the trial court's conclusion the plaintiff did not produce *prima facie* evidence of disparate impact. Notwithstanding our vacating the judgment and finding of no disparate impact, we will note for the guidance of the court on remand errors made in the court's computation of the back pay award.

### I.

In June 1978, the Department of Mental Health and Corrections (the Department) began a selection process to hire persons to fill the newly-created positions of Juvenile Court Intake Workers, pursuant to legislation becoming effective July 1, 1978. *See* 15 M.R.S.A. § 3001 *et seq.* The new JCIW

positions were to be administered from each of the Department's four probation and parole districts. Five such workers were to be employed within District I, comprising York, Cumberland, and southeastern Oxford Counties.

All applicants for the JCIW positions filed applications with the State through the Department of Personnel, completed a written examination and oral board examination, and received a combined score from the Department of Personnel. Those applicants with a sufficiently high score received a certificate of minimum qualification, which allowed them to proceed to the next step in the selection process.

On June 8 and 9, 1978, twenty such certified applicants who had expressed an interest in employment in southern Maine were interviewed for positions in District I by District Supervisor James Farr. Peter Tilton, then Assistant Director of the Division of Probation and Parole, and Martin Magnuson, then a Probation and Parole Officer in District I, were also present at the District I interviews.

During the course of each interview, Mr. Farr, using a Department of Personnel form developed for use in an oral board examination for the position of "guard sargeant" at a correctional institution, awarded each applicant a numerical grade for each of seven categories,[5] together with an overall numerical grade which was apparently an average of the several scores.

Intake Workers were to be assigned to District Courts serving Springvale, Biddeford-Saco, Portland, Brunswick-Yarmouth, and Bridgton. Mr. Farr noted which of

**4.** The Superior Court's order does not state whether it found the defendant guilty of sex discrimination or age discrimination with respect to Aurora Kellman. The opinion does state, in a footnote, "The Court holds that the group between the ages of forty (40) and seventy (70) constitutes the protected class in age discrimination cases, adopting the class specified in the Age Discrimination in Employment Act, 29 U.S.C. § 631(a) (1982 Supp.)." This "holding" was in error. In *Maine Human Rights Commission v. Kennebec Water Power Co.,* 468 A.2d 307 (Me.1983), decided subsequent to the

date of the Superior Court's order in the instant case, we held the Maine statute protects persons of all ages against age discrimination in employment, not only those persons over age forty. The Superior Court's "holding" on this point, however, was actually dictum, and not germane to the decision reached.

**5.** The categories were: general appearance, self-expression, alertness, personality, interest in work, public relations ability, and leadership ability.

these assignments each applicant would be willing to accept.

District Supervisors conducted similar interviews in each of the remaining three probation and parole districts. The supervisors subsequently met in Augusta with the Director of Corrections, Donald Allen, and several other supervisory personnel within the Division of Probation and Parole. At that meeting, Mr. Allen, who was the actual hiring authority, received the recommendations of each of the supervisors as to which applicants should receive offers of employment. Ultimately, Mr. Allen authorized an offer of employment to every applicant recommended by a District Supervisor. Mr. Farr recommended one female and four male applicants, the oldest of whom was 32 years of age. Either Mr. Farr, or a person acting under his direction, made an offer of employment to each of these individuals. Two of the males declined the offers. Mr. Farr then communicated with his superiors and recommended, and extended offers to, two more males, both under the age of 32.

Aurora Kellman was 57 years old at the time she applied for a JCIW position in District I. She received a certificate of minimum qualification from the Department of Personnel, and was subsequently interviewed by Mr. Farr. She indicated to him she would accept a position in either of the two York County District Courts. From March 1975 until the fall of 1977, she had been employed as an intake worker in an experimental juvenile offender diversionary project in York County. During the course of her interview with Mr. Farr, Ms. Kellman declined to discuss problems that had arisen in the course of that pilot project as they related to a change in the program's directorship. Mr. Farr's notes on the interview indicated Ms. Kellman "seems on [the] defensive," "declines to discuss problems between York Juvenile Intake Bureau and PD's," and "seems to resent replacement of York Unit by State program." He also noted "her attitude would be poor for PR." Mr. Farr did not recommend her to Mr. Allen, and she did not receive an offer of employment.

On August 11, 1978, Aurora Kellman filed a complaint of discrimination with the Maine Human Rights Commission, pursuant to 5 M.R.S.A. § 4611 (1979), alleging she had not been hired for a JCIW position in District I because of her age and sex. The Commission investigated the complaint, found "reasonable grounds to believe that unlawful discrimination has occurred," and proposed the parties enter into a conciliation agreement. When no settlement could be reached, the Commission, on behalf of Aurora Kellman, instituted this action in Superior Court on June 12, 1980.

II.

At trial, the plaintiff called as witnesses Aurora Kellman, Robert Maxwell (a member of the Department of Personnel), James Farr (the District I Supervisor), and Homer Hayslett, an expert in mathematics and statistics. The defendant called Donald Allen (the Director of Corrections), and Peter Tilton and Martin Magnuson, both of whom had been present at the District I interviews. After hearing the witnesses' testimony, the court, in its opinion, utilized both the disparate impact and disparate treatment modes of analysis, as described by this court in *Auburn I*, to evaluate the evidence presented at trial.

1. *Disparate Impact*

█ In *Auburn I* we explained the plaintiff in an employment discrimination case makes a *prima facie* showing of disparate impact "where an employer's practice (such as a written or oral test, or a particular job requirement) is facially neutral but in fact affects more harshly one group than another." 408 A.2d at 1264, citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 426, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), and *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The *prima facie* case may be made by a showing that "the tests in question

[here, the interview process] select applicants for hire or promotion in a ... pattern significantly different from that of the pool of applicants." *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375.

It is the plaintiff's contention that Mr. Farr's oral interviews and his subjective selection process affected female applicants and those over age forty more harshly than other applicants. At trial, the parties stipulated there was no correlation between the applicants' scores on the written and oral tests given by the Department of Personnel, and the ratings of the applicants made by Mr. Farr on the basis of his oral interviews.

The Superior Court concluded the plaintiff had not adduced sufficient evidence to constitute a *prima facie* showing of disparate impact. In *Auburn I* we explained, "The primary method of establishing a skewed selection process is by statistical evidence." 408 A.2d at 1264. The court, noting that "appropriate personality, subjectively evaluated in Mr. Farr's oral interview, was itself a job qualification that resulted in a ranking of the candidates," determined the probability analysis given by the plaintiff's expert witness was faulty because it failed to take into account this subjective factor. The expert's analysis was based on the assumption that all twenty applicants interviewed in District I were equally well qualified.[6] However, because having an "appropriate personality," as determined by Mr. Farr at the oral interview, was in itself a qualification for the job, the court found the conclusions of the expert which ignored this fact were erroneous, and "do not by themselves, tend to prove that any discrimination was present in the process."

We agree with the court's conclusion. The defendant clearly had the right to make possession of an "appropriate personality" one qualification for the JCIW positions. The probability analysis given by the plaintiff's expert witness, ignoring as it did this variable, and assuming all twenty applicants were equally qualified for the jobs, was properly disregarded by the court.

Additionally, the Superior Court rejected any statistical analysis of the data, finding that "a sample of twenty (20) is insufficient to permit a reasonable inference of discrimination in the selection process of Mr. Farr based purely upon the *result* of the distribution of those selected."

At trial, the plaintiff's expert adduced probability, rather than statistical, analysis.[7] The expert testified: "This is not a statistical problem, this is a probability problem." We have examined the record testimony of the expert witness and find that throughout he spoke in terms of probability analysis, and stated on cross-examination that "for statistical analyses, you generally need a size sample that will allow you to get the precision you want in your estimates." The court asked the witness: "Is there a reason for groups under 100 not being valid for statistical purposes that the sample is insufficient?" The witness answered, "That's correct." Having reviewed the testimony adduced at trial, we decline to overturn as erroneous the court's conclusion the plaintiff did not make a *prima facie* showing of disparate impact. We therefore deny the plaintiff's cross-appeal on this issue.

2. *Disparate Treatment*

When, as in the present case, the plaintiff in an employment discrimination

6. The expert witness testified that when he prepared his probability analysis, he construed from the applicants' test scores that they were all equally qualified. He added: "If you don't assume that they are equally all qualified, the problem is extremely difficult to figure out the probability."

7. The expert witness explained the difference between probability and statistical analysis in this way: "Generally in statistics you don't know the underlying reality; you draw a sample and you try to infer what the underlying reality is whereas in probability theory, you generally know the underlying reality."

action alleges that disparate treatment has resulted from the defendant's facially neutral hiring practices, the court must undertake a three-step evaluation of the evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Auburn I,* 408 A.2d at 1262. "The plaintiff at all times retains the ultimate burden of persuasion on the question whether unlawful discrimination has occurred." *Id.*

■ The Superior Court decided the plaintiff had made the requisite *prima facie* case to support an inference of discrimination. The plaintiff proved Aurora Kellman belonged to the protected female class, that she applied and was qualified for the job sought, and that she was rejected. *See Auburn I,* 408 A.2d at 1263, citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. We find no error in the court's conclusion the plaintiff met its *prima facie* burden of proof.

The second evaluative step requires the court to "ascertain whether the record contains any evidence having probative force indicating at least on its face that the defendant had 'some legitimate, nondiscriminatory reason' for the rejection of the plaintiff." *Auburn I,* 408 A.2d at 1262, quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. The Superior Court found the defendant met this burden of production by adducing evidence that "the oral interview evaluation by Mr. Farr is a relevant job requirement in order to evaluate the personality of the applicant to determine whether the individual applicant possesses the necessary human relations skills for the job of juvenile intake worker."

■ We agree with the Superior Court's finding that the defendant sufficiently rebutted the plaintiff's *prima facie* case by articulating lawful reasons for its hiring practice. As the United States Supreme Court stated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 257, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981), "[t]o satisfy this intermediate bur-

den, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."

■ This court has previously recognized that an employer may legitimately use his subjective evaluation of job applicants, formed on the basis of an oral interview, as one factor in his hiring decision. *Maine Human Rights Commission v. City of Auburn,* 425 A.2d 990, 997–98 (Me.1981) (*Auburn II*). *See also Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 176 (1st Cir.1978). The job description for the JCIW position listed among "Entry Level Knowledges, Skills and Abilities":

—Ability to maintain composure in stressful situations.

—Ability to exercise judgment, common sense, and maturity in interpersonal situations.

—Ability to listen, be empathetic, and act appropriately in counseling or other interpersonal relationships.

—Ability to deal with crisis situations and associated emotions.

—Ability to relate to a variety of people.

—Ability to communicate effectively, orally and in writing.

We agree with the Superior Court that the defendant produced sufficient evidence that "one's personality, subjectively evaluated, is a legitimate qualification for the professional position of juvenile intake worker."

■ The third stage of "disparate treatment" analysis undertaken by the court involved an evaluation of all the evidence to determine if the nondiscriminatory reason offered by the employer for rejecting the plaintiff was a pretext for what was actually a discriminatory purpose in the hiring process. *Auburn I,* 408 A.2d at 1267, citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. To make this determination, the court may consider facts as to prior instances of the defendant's

discrimination, statistics as to the defendant's policy and practice of discriminatory hiring, the strength of the inference of discrimination arising from the plaintiff's *prima facie* case, and the judge's own assessment of the credibility of the witnesses. *Auburn I*, 408 A.2d at 1267–68. The plaintiff meets its ultimate burden to prove employment discrimination if "on the entirety of the evidence the judge concludes that the reasons claimed by the defendant to be legitimate, nondiscriminatory reasons for the rejection of [the applicant] were in fact pretexts for discrimination." *Id.* at 1268.

The Superior Court determined the defendant's proffered reason for its hiring decision was a pretext. In reaching this conclusion the court relied heavily on the fact that although Mr. Farr and the other persons present at Ms. Kellman's interview reached the same negative conclusions about her personality, Mr. Farr did not attempt to contact Ms. Kellman's former employer to "verify and compare" his personality evaluation. The court stated: "Particularly because of this failure to check her prior performance in a markedly similar position as the one for which she applied in this case, the Court is unable to credit Mr. Farr's evaluation, although supported as it was by the testimony of Mr. Tilton and Mr. Magnuson."

While the court's finding that Mr. Farr's testimony was not credible is entitled to deference unless clearly erroneous, we believe the court in this case has gone too far. The court disbelieved Farr's testimony that he found Ms. Kellman's personality unsuitable for the job. The reason for this disbelief was that the court decided if Farr had actually found Ms. Kellman's personality to be inappropriate, he would have contacted her former employer to verify his finding. Because Farr did not make such a reference check, the court found incredible Farr's independent negative evaluation of Kellman's personality. By reasoning in this way, the court effectively deprived Farr of his right to come to an independent assessment of Kellman's fitness for the job, and imposed on the employer an obligation, where none existed in law, to do a reference check on a job applicant.

 Mr. Farr did not contact previous employers of any of the applicants for the JCIW positions. The Superior Court erred in finding the omission to check Kellman's references to be indicative that Farr's testimony concerning his evaluation of Kellman's personality was incredible. We stated above that Farr's use of the oral interview to provide a subjective assessment of the applicants was permissible and lawful. The defendant does not bear the burden of proving its hiring practice was nondiscriminatory. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. As the Supreme Court has stated,

> [T]he employer has discretion to choose among equally well qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think the employer misjudged the qualifications of the applicants does not in itself expose him to ... liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.

*Id.* at 259, 101 S.Ct. at 1096.

 Because the court erred in its finding the employer was obligated to do a reference check on the applicant if he found her personality to be "inappropriate," we must vacate the judgment. The Superior Court order also cites other findings to support its conclusion that the nondiscriminatory reasons put forth by the employer for rejecting the plaintiff were a pretext. We cannot tell, however, whether these other factual findings, standing by themselves, would have induced the court to believe that the employer was guilty of disparate treatment of Aurora Kellman. The case must therefore be remanded for the justice's reexamination of the evidence, in light of this opinion, to determine whether, on the basis of the remaining factual findings, the ultimate conclusion of law is sustainable. *Paradis v. School Adminis-*

*trative District No. 33 School Board,* 446 A.2d 46, 51 (Me.1982).

### III.

Because we have vacated the judgment, we are not required to address the issue presented on cross-appeal relating to the damages. However, for the guidance of the court on remand, should it enter judgment for the plaintiff, we address the plaintiff's contention that the court erred in its calculation of the amount of the back pay award. 5 M.R.S.A. § 4613(2)(B)(2) (Supp. 1983–1984).

The Superior Court ordered the defendant to employ Ms. Kellman as a JCIW in District I, and awarded her back pay retroactive to June 26, 1978, "includ[ing] credit for all employment benefits such as seniority, health insurance, accrued vacation pay, and employer contributions to the state retirement fund." However, the court then reduced the back pay award by 50%, finding Kellman's job search during the period of her unemployment "was not as reasonably diligent as is necessary in order to mitigate her damages." The court order specifically referred to the fact Ms. Kellman "rejected an offer to consider her application for the position of probation and parole officer in Skowhegan, and for some time during the period from 1978 to the present, she maintained that she had no interest in employment as a juvenile court intake worker." Further, the court subtracted from the one-half back pay award "the amount of unemployment benefits which were paid to Ms. Kellman and her actual earnings from other employment during this period."

In *Auburn II* we made it clear that back pay awarded as relief for unlawful employment discrimination is to be reduced by "actual earnings on another job during the pertinent period," or "by whatever amount [the victim] could with reasonable diligence have earned during that time." 425 A.2d at 999. The burden is on the employer to prove facts to enable the court

to determine the appropriate deduction. *Id.*

The evidence in the instant case does not support the defendant's contention, and the court's conclusion, that Aurora Kellman failed to be reasonably diligent in seeking alternate employment. The plaintiff adduced evidence that since her rejection by the defendant in 1978, Kellman worked, for limited periods, in at least eight jobs, and applied for more than a dozen others. Ms. Kellman had lived in Springvale for many years; the JCIW position she sought was in York County, although she indicated her willingness to be based in Cumberland County, and work half-time in York County. Based on all this evidence, we find the court's conclusion that Kellman acted unreasonably in not applying for an available job in Skowhegan to be erroneous. As the court stated in *Equal Employment Opportunity Commission v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919 (S.D.N.Y.1976), *aff'd,* 559 F.2d 1203 (2d Cir.1977),

> defendant's burden of proving a lack of diligence is not satisfied merely by a showing that there were further actions that plaintiff could have taken in pursuit of employment. Rather, defendant must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment. The range of reasonable conduct is broad and the injured plaintiff must be given the benefit of every doubt in assessing her conduct.

420 F.Supp. at 925, *cited in Auburn II,* 425 A.2d at 999. Thus, while the court on remand is free to deduct from Kellman's back pay award amounts she actually earned or with reasonable diligence could have earned during the pertinent period, her decision not to apply for a job available in Skowhegan must not be construed as unreasonable.

The court also erred in ordering Kellman's back pay award reduced by the amount of unemployment compensation she received. Some courts have held the

deduction of unemployment compensation benefits from a back pay award should be left to the discretion of the trial court. *E.g., Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 47 (2d Cir.1980); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 401 (3rd Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Satty v. Nashville Gas Co.,* 522 F.2d 850, 855 (6th Cir.1975), *vacated and remanded on other grounds,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). These courts have focused on the holding of *National Labor Relations Board v. Gullett Gin,* 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1950), that it was within the discretion of the National Labor Relations Board to refuse to deduct unemployment compensation payments from back pay awarded for a labor violation.

We believe the better view is taken by those courts which conclude that "a more faithful following of the practice under the labor laws and the decision in *Gullett Gin* requires that deducting unemployment payments from ... back pay awards should be consistently disallowed." *Brown v. A.J. Gerrard Manufacturing Co.,* 715 F.2d 1549, 1550 (11th Cir.1983). *Accord Kauffman v. Sidereal Corp.,* 695 F.2d 343, 346–47 (9th Cir.1982); *Equal Employment Opportunity Commission v. Ford Motor Co.,* 645 F.2d 183, 195–96 (4th Cir.1981), *rev'd on other grounds,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). We agree with the *Brown* court that "[a] consistent approach to this legal question seems preferable to a virtually unreviewable discretion which may produce arbitrary and inconsistent results." 715 F.2d at 1551.

■ In addition, we believe the same considerations adhere in this discrimination case as guided our decision in *Werner v. Lane,* 393 A.2d 1329 (Me.1978). There, in the context of a tort action, we adopted the collateral source rule as the law in Maine, and held the fact that the injured party received free medical care did not preclude her recovering from the tortfeasor the reasonable value of those medical services as part of her compensatory damages. The rationale for application of the rule in tort actions applies with equal force in employment discrimination cases. If either the victim of the discrimination or the discriminating employer is going to receive a windfall because part of the victim's loss has been paid for by a third party, it is more just that the windfall should inure to the injured party than to the wrongdoer. *Id.* at 1335–36, quoting *Olivas v. United States,* 506 F.2d 1158, 1163–64 (9th Cir. 1974).

■ In *Auburn II* we stated: "it is only the compensation that plaintiff ... received or could reasonably have received *on another job* that is relevant in determining what she lost by being unlawfully barred from a ... job." 425 A.2d at 999 n. 8 (emphasis added). In accord with this explanation, we hold any back pay awarded to the victim of unlawful employment discrimination should not be reduced by unemployment compensation payments received during the pertinent period.

The entry is:

Judgment vacated.

Case remanded to the Superior Court for further proceedings consistent with the opinion herein.

McKUSICK, C.J., and NICHOLS and WATHEN, JJ., concurring.