STATE OF MAINE
PENOBSCOT, SS.

FILED AND ENTERED
SUPERIOR COURT

JUL 0 5 2001

PENOBSCOT COUNTY

SUPERIOR COURT
Docket No. CV-00-22
JLH-PEN-7/5/...

Susan Simms,
        Plaintiff

v.

**ORDER ON DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

A.G. Edwards & Sons, Inc. et al.,
        Defendants

Pending before the court is the defendants' motion for summary judgment on counts 1, 2 and 3 of the amended complaint. In those counts, the plaintiff in her individual capacity seeks compensatory damages for negligent and intentional infliction of emotional distress, and she seeks punitive damages. In the remaining counts that are not directly implicated by this motion, she seeks recovery from the defendants on behalf of her father's estate.

Summary judgment is proper only if the record on summary judgment shows that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See* M.R.Civ.P. 56. To survive a motion for a summary judgment, the opposing party must produce evidence that, if produced at trial, would be sufficient to resist a motion for a judgment as a matter of law; "[t]he plaintiff must establish a *prima facie* case for each element of the cause of action." *Rodrigue v. Rodrigue*, 1997 ME 99, ¶8, 694 A.2d 924, 926.

1

In counts 1 and 2, the plaintiff alleges that the defendants committed a series of misrepresentations to her about the status of and transactions involving accounts that her late father held at A.G. Edwards. Specifically, in her NIED claim set out in count 1, she claims that the defendants "misrepresented the status of the estate stock sales, estate mutual funds sales, and the information necessary for moving these sales forward, thereby causing Plaintiff emotional distress which required professional care." Amended complaint at ¶ 35. In count 2, which sounds in IIED, she alleges that the defendants "intentionally covered up their failure to sell the stocks and mutual funds as directed and misled Plaintiff by creating false explanations of why the stocks and mutual funds were not sold in a timely manner." *Id.* at ¶ 39.

It is clear from the allegations in counts 1 and 2, from the plaintiff's rule 7(d) statement associated with the defendants' motion and from the plaintiff's written argument that, at their core and in their essence, her personal claims are based on fraud and misrepresentation.[1] Indeed, as the plaintiff argued in opposition of the pending motion, "Unless the persons and companies that engage in purposeful cover-ups and misleading conduct are held accountable, incivility will not abate." Plaintiff's Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment at 19.

In actions for fraud and misrepresentation, a successful claimant is entitled to recover compensation for pecuniary loss but not for emotional or mental pain and suffering. *Chapman v. Rideout*, 568 A.2d 829, 830 (Me.

---

[1] In the counts brought on behalf of her father's estate, the plaintiff seeks damages based on the reduction in the value of assets caused by alleged delays in the liquidation of those assets.

1990); *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987). *See also Veilleux v. National Broadcasting Co.*, 206 F.3d 92, 130 (1st Cir. 2000) (applying Maine law). Thus, as a matter of law, in light of this "well-established limitation," *Veilleux*, 206 F.3d at 130, the plaintiff is not entitled to recovery under the theories alleged in counts 1 and 2.

In count 3, the plaintiff seeks an award of punitive damages in her individual capacity, based on the tortious conduct alleged in counts 1 and 2. "[A] claim for punitive damages will not lie unless the plaintiff receives compensatory or actual damages based on the defendant's tortious conduct. . . ." *Jolovitz v. Alfa Romeo Distributors of North America*, 2000 ME 174, ¶ 11, 760 A.2d 625, 629. Counts 1 and 2 are the sole counts brought by the plaintiff in her individual capacity. Because this order will result in the entry of summary judgment for the defendants on counts 1 and 2, there is no remaining basis for an award of punitive damages to the plaintiff individually. Consequently, the defendants are entitled to summary judgment on count 3.

The entry shall be:

For the reasons set out in the order dated July 3, 2001, the defendants' motion for partial summary judgment is granted. Summary judgment is entered for the defendants on counts 1, 2 and 3.

Dated:  July 3, 2001

_____
JUSTICE, SUPERIOR COURT

3

| Date Filed | 1/31/2000 | PENOBSCOT | | Docket No. | CV-2000-22 |
|---|---|---|---|---|---|

County

Action CIVIL - DAMAGES          7/5/01 - S.J. FOR DEF ON COUNTS 1, 2 & 3

Francis C. Marsano Assigned Justice

ESTATE OF JEROME P. BRADLEY, Through
Personal Representative Susan Simms, and
SUSAN SIMMS,*(Amended 7/6/00)          AG EDWARDS & SONS, INC.,
~~* SUSAN SIMMS, Personal Representative of~~          JEFFREY JACKSON and
THE ESTATE OF JEROME P. BRADLEY          JEAN BURGESS

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| CHARLES HODSDON ESQ. - **W/D 5/26/00**<br>P O BOX 1006<br>BANGOR ME 04402-1006 | EATON PEABODY BRADFORD & VEAGUE<br>P O BOX 1210, BANGOR ME 04402-1210<br>BY: Bernard J. Kubetz, Esq.<br>FOR: All Defendants |
| BRETT D BABER ESQ. - 5/16/00<br>RUDMAN & WINCHELL<br>P O BOX 1401, BANGOR ME 04402-1401<br>FOR: Susan Simms | |
| Weeks & Baber 304 Hancock St.<br>Suite 2E, Bangor, Maine 04401 | |

| Date of Entry | |
|---|---|
| 1/31/00 | Complaint filed. |
| 1/31/00 | Officer's Return of Service as to Jean Burgess filed (s.d. 1/6/2000) |
| 1/31/00 | Officer's Return of Service as to Jeffrey Jackson filed (s.d. 1/6/2000) |
| 1/31/00 | Officer's Return of Service as to AG Edwards & Sons, Inc. filed. (s.d. 1/7/2000 by William Richardson, Portland ME) |
| 2/1/00 | Case File Notice Postcard forwarded to Plaintiff's counsel. |
| 2/7/00 | Defendants' Motion to Extend Time for Answering Complaint filed. |
| 2/8/00 | Order on Motion to Extend Time filed. After consideration of Defendants' Motion to Extend Time for Answering Complaint, it is hereby ordered that Defendants shall have until and including February 11, 2000 to file an Answer to the Complaint. (Hjelm, J.) Copy forwarded to attorneys of record. |
| 2/10/00 | Defendants' Affirmative Defenses and Answer to Complaint filed. |
| 2/14/00 | Scheduling Order filed. Discovery Deadline is November 1, 2000. (Marsano, J, Specially Assigned Justice) Copy forwarded to attoreys of record. |
| 2/16/00 | Notification of Discovery Service filed by Plaintiff: Notice of Dep' of Jean Burgess, Notice of Deposition of Jeffrey Jackson, and Noti' Deposition of Harry Moses. |
| 2/17/00 | Notification of Discovery Service filed by Plaintiff, Amended Deposition of Jean Burgess, Jeffrey Jackson and Harry Moses |
| 2/24/00 | Jury trial fee, $300.00 paid by Charles Hodsdon, Esq. f' |

9.

STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-00-239
JLH -PEN- 5/20/2002

DONALD L. GARBRECHT
LAW LIBRARY

April Achorn,
    Plaintiff

JUN 5 2002

v.

Decision and Judgment

FILED & ENTERED
SUPERIOR COURT

MAY 2 0 2002

PENOBSCOT COUNTY

Harold Grant, Jr., et al.
    Defendants

Hearing on the complaint and counterclaim was held on January 23 and 24, 2002. On both hearing dates, all parties were present with counsel. The record developed at the trial was left open to allow the parties to submit, by agreement, the deposition transcript of John Nye. Additionally, when the record was complete, the parties filed written argument. The court has considered this additional material.

During the trial, the plaintiff offered into evidence a number of audio tapes of conversations she had with defendant Harold Grant, Jr. and one that a third person, Gilliam Fitzpatrick had with Grant. The plaintiff recorded those conversations surreptitiously. The taped conversations were both telephonic and face-to-face. All of the face-to-face conversations occurred on the premises of defendant Bangor Athletic Club ("BAC"). At trial, the court ruled on all of the grounds of the defendants' objections with the exception of their argument that the tapes of the face-to-face conversations were largely inaudible. The court reserved ruling on this ground until there was an opportunity to listen to those tapes. To tape those conversations, the plaintiff put a tape recorder in her pocket. Accordingly, the sound quality of those tapes is poor. Having now listened to those tapes, the court sustains the defendants' objections to the admission of the tapes of the face-to-face conversations at BAC and excludes plaintiff's exhibits 5, 6 and 11. Much of the dialogue on the tapes simply cannot be understood and has no evidentiary value. The remainder of those tapes (that is, the audible sections)

1

therefore constitutes only limited portions of ongoing conversations. Because the context of those marginally audible sections cannot be assured, the court excludes them as well.

This action arises out of the plaintiff's former employment with BAC, a health and fitness facility located in Bangor. The plaintiff started work with BAC in 1991. It appears that she had administrative responsibilities for the ongoing operation of the business from that time. Starting in 1993, she also worked as a personal trainer on BAC's premises. In early 1998, defendant Harold Grant Jr. became a part owner of BAC and, during that summer, he apparently became the sole owner.[1] The plaintiff alleges that after Grant (or his wife) acquired BAC in mid-1998, Grant engaged in an actionable course of conduct in which he attempted to develop a sexual or personal relationship with her. In this action, the plaintiff alleges that both Grant and BAC are liable to her for violations of the Maine Human Rights Act (count 3 and 4) and on the basis of common law claims of assault and battery (count 5), invasion of privacy (count 6), negligent and emotional infliction of emotional distress (count 7) and breach of an employment contract (count 8).[2] Grant has brought a counterclaim seeking recovery for amounts he claims are owed under a lease for a car that he obtained for the plaintiff's use and benefit.

## A. Maine Human Rights Act

The plaintiff first alleges that BAC and Grant are liable under the provisions of the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.* Of the remedies that are otherwise available under the MHRA, only backpay (including the value of any benefits) can be considered here.[3] Other forms and categories of damages cannot be awarded because the plaintiff did not pursue this claim administratively with the Maine Human

---

[1] Grant has testified variously that he owned BAC, and that his wife owned the business but that he managed the operations.

[2] The plaintiff also brought claims under Title VII of federal anti-discrimination laws (counts 1 and 2). Summary judgment was previously entered for the defendant on those claims.

[3] In their motion for summary judgment, the defendants successfully argued that the plaintiff's failure to seek relief from the Maine Human Rights Commission forecloses the availability of attorney's fees and civil penalties. The question presented now is whether under 5 M.R.S.A. § 4622 the absence of an administrative proceeding also precludes the recovery of other types of damages.

Rights Commission. Title 5 M.R.S.A. § 4622(1) provides that if a claimant does not seek administrative relief through the MHRC, that claimant may not recover "compensatory and punitive damages under section 4613 . . ." in a court action. *See also* L.D. 1713, Statement of Fact (118th Leg. 1997). A 1997 legislative amendment to section 4613 expanded the scope of relief that was previously available to persons aggrieved by violations of the MHRA. *See* P.L. 1997, c. 400, § 1. Previously, in a monetary claim of employment discrimination, such a plaintiff was entitled to recover only for backpay, including the value of benefits. *See LaPlante v. United Parcel Service*, 810 F.Supp. 19, 22 (D.Me. 1993); *Greene v. Union Mutual Life Ins. Co.*, 623 F.Supp. 295, 298-99 (D.Me. 1985). As a result of the 1997 legislation, in cases of intentional employment discrimination, a plaintiff also became entitled to seek recovery for compensatory and punitive damages. 5 M.R.S.A. § 4613(2)(B)(8). In 1997, section 4622(1) was simultaneously amended to its present form, so that the new categories of damages could be awarded only if the plaintiff had filed a complaint with the MHRC. *See* P.L. 1997, c. 400, § 2. Because the plaintiff at bar failed to do so, the categories of damages enumerated in section 4613(2)(B)(8) are not available to her in this case. Consequently, under her MHRA claims, she cannot recover for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses and . . . punitive damages . . . ." 5 M.R.S.A. § 4613(2)(B)(8)(e). In other words, her damages are limited to those losses that were compensable prior to the 1997 statutory amendments.

The same result obtains from a separate analysis. When the Legislature expanded the categories of recoverable damages for employment discrimination cases in 1997, it imposed varying limitations on the sum of compensatory and punitive damages. 5 M.R.S.A. § 4613(2)(B)(8)(e). Those limitations are a function of the size of the employer as measured by the number of its employees. The lowest threshold addressed in the statute is 15 employees. 5 M.R.S.A. 4613(2)(B)(8)(e)(i). The Legislature simply did not address the exposure of employers who had 14 or fewer employees. There is no evidence that BAC had more than 14 employees during the time periods framed in section 4613(2)(B)(8)(e); indeed, in the face of the defendants' suggestion that BAC did not have more than 14 employees in each of 20 or more weeks during the current or

preceding year, the plaintiff argues that the statutory limitation on damages does not apply. This statutory ambiguity calls for the court to construe section 4613(2)(B)(8)(e).

The principal objective in statutory interpretation is to give effect to the Legislature's intent. *Great Northern Paper v. Penobscot Nation*, 2001 ME 68, ¶ 15, 779 A.2d, 574, 580. To determine that intent, the court looks first to the statute's plain meaning and, if there is ambiguity, to the legislative history. *Id.* "'[W]e avoid statutory constructions that create absurd, illogical, or inconsistent results.'" *Brent Leasing Co., Inc. v. State Tax Assessor*, 2001 ME 90, ¶ 6, 773 A.2d 457, 459 (citation and internal punctuation omitted).

In section 4613(2)(B)(8)(e), the Legislature has established limits of an employer's liability for compensatory and punitive damages. Businesses with a greater number of employees are exposed to greater liability than those with fewer employees. Although the Legislature did not expressly indicate the extent of potential liability for employees with fewer than 15 employees, the court concludes from the statutory structure embodied in section 4613(2)(B)(8)(e) that it did not intend to create any exposure at all for those employers. It would not be logical to expose employers of all other sizes to limited liability for compensatory and punitive damages, while subjecting smaller-sized businesses to unlimited liability. This is particularly true when smaller-sized employees have lesser exposure than the larger ones.

This conclusion is supported by the Legislature's expression of its own intention. In enacting section 4613(2)(B)(8)(e), and thereby allowing some aggrieved employees to recover compensatory and punitive damages, the Legislature intended those new "damages provisions to apply to only intentional employment discrimination, but will not be available against employers with fewer than 15 employees." L.D. 1713, Statement of Fact (118th Leg. 1997).

Therefore, because the plaintiff did not satisfy the statutory predicate to her right to seek compensatory and punitive damages, and because any such damages could not be recovered against these defendants in any event, the relief to which the plaintiff could be entitled is limited to backpay.

If the defendants are liable to the plaintiff under the Maine Human Rights Act and the plaintiff is therefore entitled to recover backpay, then any "back pay awarded as relief

4

for unlawful employment discrimination is to be reduced by 'actual earnings on another job during the pertinent period,' or 'by whatever amount [the victim] could with reasonable diligence have earned during that time.'" *Maine Human Rights Commission v. Department of Corrections*, 474 A.2d 860, 869 (Me. 1984), *quoting Maine Human Rights Commission v. City of Auburn*, 425 A.2d 990, 999 (Me. 1981). The employer bears the burden of establishing the amount of any such reduction. *Maine Human Rights Commission v. Department of Corrections*, 474 A.2d at 869. Here, the plaintiff contends that her annualized employment earnings at BAC amounted to $24,346.72. This would be equivalent to monthly income slightly in excess of $2,000. For purposes of this analysis, the court accepts this figure without further examination.

When the plaintiff separated from BAC in September 1999, she immediately entered into employment with Fairpoint Communications. Because she had that job lined up even before she separated from BAC, the plaintiff did not suffer a loss of income due to any unemployment. The plaintiff worked for Fairpoint until June 2000. Her compensation from Fairpoint included a base annual salary of $24,000 and a monthly commission.[4] For the four months in 1999 when she worked for Fairpoint, she received taxable income of $11,503, which is equivalent to more than $2,800 per month. Therefore, the defendants have established that between September 1999 and June 2000, the plaintiff did not suffer a net loss of income that would entitle her to an award of backpay.

In June 2000, the plaintiff left her position with Fairpoint because she wanted to move out of state for personal reasons unrelated to any actionable conduct committed by either defendant. She promptly found part-time work. Any diminution of earnings cannot be attributed to the defendants because it was her choice to move to a location where she worked part-time. At some point, she moved again, and she became re-employed with Fairpoint. Her compensation based on her re-employment with Fairpoint was even greater than it was when she was initially employed with the company.

---

[4] She also received a car allowance. The court does not treat this as income because it presumably offset employment-related expenses that the plaintiff incurred personally. She therefore did not receive any net gain from that allowance.

Presently, she works for a different company. Her base salary is $40,000, and she receives monthly commissions that exceed $10,000 annually.

The defendants have therefore satisfied their burden of proving that the plaintiff's actual or available earnings, subsequent to September 1999, exceeded the compensation that the plaintiff contends she received as an employee of BAC. Her actual earnings in fact exceeded the level of compensation she received at BAC except for a period of several months while she was employed on a part-time basis. However, the record demonstrates that the plaintiff was capable of gainful, full-time employment even during that limited duration. As a result, the court need not and does not reach the plaintiff's allegation that the defendants violated the provisions of the Maine Human Rights Act because, even if they did so, the plaintiff is not entitled to any relief otherwise available to her under the provisions of that statute.

## B. Assault and battery

The plaintiff alleges that Grant is liable to her for assault and battery, based on three separate incidents. The court finds that these incidents occurred. First, in September 1998, at the workplace Grant struck the plaintiff's buttocks with some mail that he held, and he then touched her shoulder and arm. Second, in October 1998, the Grant struck her buttocks again while they were on the BAC premises, although this time he used a telephone. He explained to her that he was simply having some fun at work. Finally, shortly before Christmas 1998, Grant tried to hug the plaintiff when they were at the BAC premises. She responded by turning away. The defendant attributes this contact to an expression of holiday greetings.

Common law civil assault occurs when a person acts with the intention of causing either offensive or harmful physical contact with another person or the imminent apprehension of such contact, and in fact the other person is put in imminent apprehension of such contact. RESTATEMENT (SECOND) OF TORTS § 21(1) (1965). Here, the plaintiff has neither argued nor proven that Grant committed this tort. Rather, she argues that Grant is liable for acts that consist of improper touching. Therefore, her argument is really one of common law civil battery.

"An actor is subject to liability to another for battery if . . . he acts intending to cause a harmful or offensive contact with the person of the other . . . and . . . an offensive

6

contact with the person of the other directly or indirectly results." RESTATEMENT (SECOND) OF TORTS, *supra* at § 18(1). Here, Grant argues that the nature of the contact was of such small magnitude that it was not offensive and that he did not intend to commit an act that was offensive to the plaintiff.

Bodily contact is deemed to be offensive "if it offends a reasonable sense of personal dignity." RESTATEMENT (SECOND) OF TORTS, *supra* at § 19. To be actionable, such contact must be "unwarranted by the social usages prevalent at the time and place at which it is inflicted." *Id.*, comment a. Particularly in the context of this case, Grant's physical contact with the plaintiff was offensive. The very act, in which an employment supervisor strikes the buttocks of a subordinate in an attempt to be playful or affectionate, and while the parties are in a business location where others are present, is clearly beyond the bounds of propriety. Indeed, the parties agree that when Grant touched her the first time, the plaintiff promptly told him not to do it again. Further, Grant's conduct must be seen as part of his attempt to develop a romantic or sexual relationship with the plaintiff. Seen in this context, Grant's decision to initiate physical contact with the plaintiff cannot be minimized as good-natured and innocuous. Rather, under the existing circumstances, the physical contact initiated by Grant must be regarded as demeaning and offensive to the plaintiff's dignity.

Next, in order for a touching to rise to the level of battery, the perpetrator either must intend to harm or offend the respondent, or he must act "with knowledge that such a result will, to a substantial certainty, be produced by his act." RESTATEMENT (SECOND) OF TORTS, *supra* at § 18, comment d. Here, Grant did not intend to harm or offend the plaintiff by means of the physical contact he imposed on her. He was motivated by a naïve and selfish desire, not to harm her in some way, but to expand the parameters of his relationship with her. Nonetheless, the circumstances known to Grant at the time of those three incidents demonstrate that he also was aware that his conduct would be offensive to the plaintiff. The nature of the contact initiated by Grant on the first two occasions is inherently offensive. If there was any room for doubt, after Grant touched the plaintiff the first time, she put him on notice that she objected to physical contact with him. The defendant knew that a hug – whether or not it occurred during the Christmas season – would be unwelcome and offensive. Further, all three incidents occurred on the BAC

premises, where others were present. And at least by the end of 1998, the plaintiff had made clear to the defendant that she had not intention of acceding to the type of relationship that he had in mind.

For these reasons, the plaintiff has established that Grant committed common law battery against her. Further, BAC does not counter the plaintiff's argument that it is liable for Grant's tortuous conduct because he committed those acts in the workplace.

The plaintiff did not sustain any personal injury or incur any financial loss as a result of these batteries. Rather, any damages arise from the humiliation and emotional distress caused by Grant's tortious conduct. Although the plaintiff in fact suffered those losses, the emotional impact of Grant's conduct also must be viewed from a broader perspective, which was a significant focus of the parties' trial presentations and subsequent argument. Notwithstanding Grant's testimonial denials of any interest in developing a personal relationship with the plaintiff, that clearly was his objective. He made those intentions clear in his telephone conversations with her. The record also demonstrates that the plaintiff did not have a corresponding interest in Grant and that she told him so. These factors support the plaintiff's argument that she was emotionally upset by the batteries committed by Grant.

On the other hand, the plaintiff manipulated Grant's interest in her and exploited his generosity toward her, for her own personal material gain. The plaintiff argues that she accepted cash and gifts from Grant only because he pressured her to do so. The weight of evidence, however, undermines this argument. The amount of cash and value of the gifts, when combined, was well into five figures. Many of the items were recreational or otherwise not necessary in nature. During the plaintiff's testimony, she reluctantly acknowledged that she told Grant that she wanted particular items of personal property and in some instances even expressed to him a preference of one model or style over another. He gave her money earmarked to purchase specific items, and she followed through by making those purchases herself. The evidence also shows that on several occasions, she and Grant went to various stores together, and she picked out merchandise that Grant would then purchase. When discussing the gifts with others, the plaintiff seemed to be pleased that she had received them. She was known to thank him for some of the gifts he gave to her.

8

The May 3, 1999, telephone conversation between the plaintiff and Grant, *see* plaintiff's exhibit 9, is particularly telling. During that exchange, the plaintiff explained to Grant that she would be unable to reimburse him for the lease payment associated with the vehicle that Grant had obtained for the plaintiff's use. Grant threatened to terminate the arrangement, which would interfere with the plaintiff's plans to drive to Portland. Grant's response angered the plaintiff. Although the plaintiff told Grant that her anger was due to his persistent interest in having an affair, the progression of the conversation demonstrates that the true source of her agitation was the possible deprivation of the vehicle and the inconvenience it would cause her. Although this conversation occurred well after the last of the batteries, it is illustrative of the plaintiff's broader willingness to tolerate Grant's improper advances, in order to realize personal benefits. Her acceptance of significant amounts of cash and personal property (some of which had considerable value) closer in time to the batteries shows that even then, the emotional impact caused by Grant's conduct was mitigated and that the resulting injury is substantially less than would befall a person who sought to reject improper advances unconditionally.

For these reasons, the plaintiff's compensatory damages caused by Grant's batteries are $2,000.

The plaintiff also seeks an award of punitive damages. An award of punitive damages is an expression of "society's disapproval of intolerable conduct," *Caron v. Caron*, 577 A.2d 1178, 1180 (Me. 1990), and serves as a deterrent against similar conduct in the future, *Braley v. Berkshire Mutual Insurance Co.*, 440 A.2d 359, 362 (Me. 1982). Punitive damages may be awarded only if the plaintiff establishes by clear and convincing evidence that the tortfeasor acted with actual or implied malice. *Tuttle v. Raymond*, 494 A.2d 1353, 1361, 1363 (Me. 1985). Actual "malice exists where the defendant's tortious conduct is motivated by ill will toward the plaintiff." *Id.* at 1361. A person acts with implied malice "where deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id.* Malice is not proven by evidence of conduct that is merely reckless. *Id.*

The court concludes that the defendant's conduct, taking the form of several incidents of battery, warrants the imposition of punitive damages. Although Grant's

9

conduct was not motivated by ill will or an intention to harm the plaintiff, he knew that his acts would demean and humiliate her. His superior position within the structure of BAC aggravates the reprehensibility of his conduct. The importance of an employee's freedom from an employer's personal advances is embodied in the Maine Human Rights Act and other similar provisions. Grant's conduct is particularly deserving of the type of condemnation that is manifest in an assessment of punitive damages. Finally, his conduct was repeated and did not consist of a single decision to invade her legal interests.

In assessing the amount of punitive damages, the court must consider mitigating as well as aggravating factors. *Hanover Insurance Co. v. Hayward*, 464 A.2d 156, 158 (Me. 1983). Here, as is noted above, Grant's conduct is within that qualitative range that deserves imposition of punitive damages, but the malice that characterized his conduct was implied rather than actual. Additionally, the court takes into account that the plaintiff's actual damages – although real – are not of a highly substantial magnitude. Based on factors relevant to this analysis, the court imposes punitive damages of $5,000 based on the batteries committed by Grant. Because of the high level of responsibility he bears at BAC, those damages are also assessed against the business, jointly and severally. *See Kopenga v. Davric Maine Corp.* 1999 ME 65, ¶ 25, 727 A.2d 906, 911.

### C. Invasion of Privacy

The plaintiff next contends that the defendants are liable for invasion of her privacy. This cause of action is premised on "the interest of an individual in leading, to some reasonable extent, a secluded and private life, free from the prying eyes, ears and publications of others." RESTATEMENT (SECOND) OF TORTS, *supra* at § 652A, comment b. Of the several forms that this cause of action may take, the plaintiff specifically argues that Grant intruded upon her "physical and mental solitude or seclusion . . . ." *See Estate of Berthiaume v. Pratt*, 365 A.2d 792, 795 (Me. 1976); RESTATEMENT (SECOND) OF TORTS, *supra* at § 652B. To prove this type of claim, the plaintiff must establish that the defendant intentionally intruded upon her solitude or seclusion or her private affairs or concern, and that the intrusion would be highly offensive to a reasonable person. RESTATEMENT (SECOND) OF TORTS, *supra* at § 652B. The magnitude of the interference must be "substantial . . ., of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly

10

object." *Id.*, comment d. The conduct "must amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence . . . ." *Id.*

Without question, Grant was persistent in his efforts to create a romantic or sexual relationship with the plaintiff. However, the plaintiff has not established that Grant's conduct amounted to a substantial intrusion on her solitude, seclusion and private concerns beyond that which she was willing to accept. As is discussed above, the plaintiff voluntarily parlayed Grant's personal interest into significant material gain. In order to do so, for example, she agreed to spend time with Grant outside of the workplace. Additionally, the taped telephone conversations reveal a number of instances where the plaintiff actually encouraged Grant to articulate the nature of his interest in her and to tell her the direction he hoped their relationship would take. She may well have invited these comments in order to develop evidence against him. Nonetheless, the plaintiff's own conduct, taken in response to Grant's, substantially undermines her argument that his actions rise to the level of a tortious invasion of her privacy.

### D. NIED and IIED

The circumstances of this case do not support a claim for negligent infliction of emotional distress (NIED). Such a claim arises in one of three circumstances: first, in the context of a bystander liability claim; second, where, under the law, the nature of the relationship between the plaintiff and defendant allow such an action; and third, where the defendant also commits a separate tort against the plaintiff. *Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18, 25-26. Here, the first two circumstances are not present. However, because Grant (and, through vicarious liability, BAC) committed the tort of battery against the plaintiff, she could argue that the NIED is properly supported by the third predicate. However, when that separate tort allows recovery for emotional distress, then the damages that may be obtained in a NIED claim are subsumed by that other claim. *Id.*, 2001 ME 158, ¶ 19, 784 A.2d at 26; *Richards v. Town of Elliot*, 2001 ME 132, ¶ 34, 780 A.2d 281, 293. That is the case here.

Additionally, even if the NIED claim were cognizable, it would fail on its merits because the plaintiff has not proven that she suffered "severe emotional distress" as a result of Grant's conduct. *See Curtis*, 2001 ME 158, ¶ 20, 784 A.2d at 26. That emotional distress must reach a level "where a reasonable person normally constituted,

11

would be unable to adequately cope with the mental stress engendered by the circumstances of the event." *Gayer v. Bath Iron Works Corp.* 687 A.2d 617, 622 (Me. 1996) (internal punctuation and citation omitted). Here, the impact of Grant's conduct was not of this dimension. This is best shown by the plaintiff's ongoing pattern of conduct in which she willingly accepted money and gifts from Grant. Additionally, one would expect that the direct exchanges between the plaintiff and Grant, memorialized in the telephone conversations that the plaintiff surreptitiously taped, would provide insight into emotional effects caused by Grant's persistent entreaties. However, as is discussed above, the plaintiff displayed the greatest level of emotion when she was faced with the possibility that the defendant would deprive her of the vehicle that he had provided to gain her favor.

The record demonstrates that at many times the plaintiff was frustrated with Grant's pattern of conduct and his refusal to give up. However, these circumstances continued for an extended duration, and the plaintiff allowed herself to profit from the arrangement. Even though a NIED claimant is not required to prove objective symptomatology in order to establish a recoverable degree of emotional distress, *Town of Stonington v. Galilean Gospel Temple*, 1999 ME 2, ¶ 11, 722 A.2d 1269, 1272, the degree of emotional pain and suffering demonstrated on this record is insufficient to sustain a claim for NIED.

A claim for intentional infliction of emotional distress (IIED) also rests on proof of serious emotional distress. *Champagne v. Mid-Maine Medical Center*, 1998 ME 87, ¶ 15, 711 A.2d 842, 847. Just as the plaintiff has failed to establish this degree of emotional trauma in connection with her NIED claim, she has failed to do so as part of her IIED claim.

### E. Breach of Contract

Finally, the plaintiff alleges that through Grant's conduct, the defendants breached their employment contract with her.[5] She argues specifically that Grant "promised to act

---

[5] The plaintiff asserts this contract claim against both defendants. The plaintiff's employer was BAC. In her complaint, the plaintiff alleged, and the defendants admitted, that BAC is a Maine corporation. Therefore, her contractual relationship was with BAC and not with Grant personally. Under those circumstances, there can be no contract claim against Grant himself.

12

appropriately as an employer." Even if the plaintiff has established that BAC, through Grant, breached any such term of the employment agreement, she has not proven that such a breach caused her damages.

In the circumstances of this case, the plaintiff cannot recover damages for emotional distress resulting from a breach, *see Marquis v. Farm Family Mutual Insurance Co.*, 628 A.2d 644, 651 (Me. 1993), and she cannot recover punitive damages for such a breach, *see Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me. 1989). Therefore, any recovery must be limited to an economic loss, and an award of damages would be designed to restore the plaintiff to the economic position she would have been in, in the absence of any breach. *See Down East Energy Corp. v. RMR, Inc.*, 677 A.2d 1070, 1073 (Me. 1996). For the reasons noted above, the plaintiff's financial circumstances improved after she separated from BAC in September 1999. She also has not shown that prior to her departure in September 1999, any breaching conduct by BAC prejudiced her financial condition.[6] Therefore, even if BAC breached the contract of employment, it is not liable to the plaintiff due to an absence of proven damages.

## F. Grant's counterclaim for breach of contract

In his counterclaim, Grant alleges that the plaintiff is liable to him for breach of a contract under which she was obligated to make lease payments for a car that he obtained for her benefit. The terms of the written agreement provided that the plaintiff would pay Grant the monthly sum of $324.25 "until the end of the lease and as long as April Achorn is in possession of the car." The court finds that this contract unambiguously obligated the plaintiff to make those payments only for the period of time when she possessed the

---

[6] For a brief duration immediately after Christmas 1998, the plaintiff either left BAC or was terminated from employment with BAC. She returned to work and was paid for the income she otherwise would have lost during that break. *See* plaintiff's exhibit 2. Also, in March 1999, the plaintiff executed an employment contract that limited the number of hours during her work schedule when she also could work as a personal trainer. *See* plaintiff's exhibit 7. Even if this agreement was the product of a prior breach by either defendant (for example, if it was the result of improper pressure or some other conduct by Grant that constituted a violation of his contractual obligations owed to the plaintiff), then the plaintiff has not shown a loss of income, because historically the plaintiff performed personal training services for fewer hours than the limit created in the March 1999 agreement.

car. In fact, she possessed and used the car from April 1999 until September 1999. The parties dispute whether the plaintiff made the payments as they had agreed; Grant contends that she did not make those payments, and the plaintiff says that she did.[7]

Grant has not sustained his burden of proving non-performance in the form of non-payment. The quality of his case is affected generally by his doubtful credibility, as demonstrated by his willingness to testimonially deny that he told the plaintiff that he wanted to have an affair with her, when the tapes establish conclusively that he made those statements. More specifically, he alleges that the plaintiff failed to make payments during a period of time when he gave her significant sums of money and presented her with gifts of value. The cash was intended to cover a number of expenses, ranging from groceries to less compelling purchases such as vacation trips. It makes little sense that Grant would tolerate an accumulating arrearage under the terms of the contract, particularly when he was willing to make an issue out of it when the plaintiff did not make the full payment due in May.

Consequently, Grant has not established that the plaintiff is liable for breach of contract.

The entry shall be:

For the foregoing reasons, on count 5 of the complaint, judgment is entered for the plaintiff and against the defendants, jointly and severally, in the amount of $7,000. On all remaining counts of the complaint, judgment is entered for the defendants.

On the counterclaim of counterclaim plaintiff Grant, judgment is entered for the counterclaim defendant (the plaintiff).

No costs are awarded to any party; they shall bear their own costs of court.

Dated: May 17, 2002

_____
Justice, Maine Superior Court

---

[7] On the other hand, the parties do not dispute that the plaintiff did not make the May payment in full. That issue was the subject of the parties' conversation recorded on the tape admitted as plaintiff's exhibit 9. During that conversation, the parties reached an accommodation that the plaintiff would pay part of the amount due that month and have breakfast with Grant. Grant would then forgive the balance that otherwise would be due. The May payment is not in dispute.