STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-01-197,
JLH-PEN-3/26 2003



FILED & ENTERED
SUPERIOR COURT

MAR 26 2003

PENOBSCOT COUNTY

Kenneth E. Stone,
  Plaintiff

v.

Order (Defendant's Motion
for Summary Judgment)

Northeast Publishing Co.,
  Defendant

DONALD L. GARBRECHT
LAW LIBRARY

MAR 31 2003

Pending before the court is the defendant's motion for summary judgment on each of the three counts of the complaint. The court has considered the parties' written arguments and other submissions associated with the motion at bar.

Between 1992 and 2000, the plaintiff was an employee of the defendant, which publishes a weekly publication. The plaintiff sold advertising for the publication. He claims here that he suffered an adverse employment action in October 2000 as a result of his allegations that the defendant acted unlawfully in failing to pay him and other employees the amounts due to them as compensation. He also claims that he was placed on unpaid leave in October 2000 as the result of the defendant's perception that he was disabled. These allegations have been channeled into claims under the Maine Whistleblower Protection Act (WPA), 26 M.R.S.A. § 831 *et seq.* (count 1) and the Maine Human Rights Act (MHRA), 5 M.R.S.A. § 4551 *et seq.* (count 2). In his third count, the plaintiff alleges that the defendant is liable to him for unpaid wages and statutory damages under 26 M.R.S.A. § 626.

Summary judgment is proper only if the record on summary judgment shows that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See* M.R.Civ.P. 56. To survive a motion for a summary judgment, the opposing party must produce evidence that, if produced at trial, would be sufficient to resist a motion for a judgment as a matter of law; "[t]he plaintiff must establish a *prima facie* case for each element of the cause of action." *Rodrigue v. Rodrigue*, 1997 ME 99,

1

¶8, 694 A.2d 924, 926. "'A fact is material when it has the potential to affect the outcome of the suit.'" *Prescott v. State Tax Assessor*, 1998 ME 250, ¶ 5, 721 A.2d 169, 172. If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, a summary judgment may be granted." *See Green v. Cessna Aircraft Co.*, 673 A.2d 216, 218 (Me. 1996) (citation and internal punctuation omitted).

## A. Whistleblower's Protection Act (count 1)

The parties argue their positions under the burden-shifting framework adopted from federal law in *DiCentes v. Michaud*, 1998 ME 227, 719 A.2d 509. Under that formula, a WPA claimant establishes a prima facie case by demonstrating that (1) he engaged in an activity that is protected under the WPA, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. The defendant then bears the burden of producing evidence that the adverse employment action was based on a legitimate, non-discriminatory reason. Finally, the plaintiff bears the burden of persuasion to show that the reason offered by the defendant was pretextual. *Id.*, ¶ 14, 719 A.2d at 514.[1] The defendant argues here that the plaintiff's WPA claim fails as a matter of law because the evidence is insufficient to support an argument that he engaged in an activity protected under that law and that there is insufficient evidence that the adverse employment action was caused by any such conduct. The court is satisfied that the record on summary judgment generates a factual basis for these elements of the plaintiff's claim.

The record indicates that while the plaintiff was employed by the defendant, his compensation was based on a combination of salary and commissions for newspaper advertising that he sold. "On a variety of occasions," he complained that he did not receive full payment of the commissions to which he felt entitled. Defendant's Statement of Material Fact (DSMF) ¶ 11. As a result of these reports, he received some of that money. *Id.* The plaintiff talked to some of the other employees about this issue and conveyed their complaints to the defendant. Plaintiff's Opposing Statement of Material Fact (POSMF) ¶ 45. The defendant wanted him to stop, and this led to a meeting held in

---

[1] Although DiCentes did not get past the burdens associated with the prima facie case, the Law Court has made clear that the remainder of the burden-shifting approach rooted in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) applies to claims brought under Maine's WPA. *DiCentes*, 1998 ME 227, ¶ 14, n.10, 719 A.2d at 514.

2

June 2000. *Id.* At that meeting, the plaintiff advised his supervisor, John Browning, that he thought the defendant's failure to make full payments of the commissions was illegal. POSMF ¶ 15 (citing Browning deposition at p. 48). Browning notified his own supervisor, Pam Lynch, of this accusation. DSMF ¶ 15. The next day, Browning, Lynch and the plaintiff met. *Id.,* ¶ 16. The plaintiff apologized for his accusation that the defendant was stealing money (i.e., the commissions). *Id.* He also pointed out what he believed to be specific computational errors in the commission and made complaints about the method by which the defendant computed those commissions. *Id.,* ¶ 17. The plaintiff was told that if he did not like those policies, he could leave or seek employment elsewhere. *Id.,* ¶ 17; POSMF ¶ 17. Subsequent to the second meeting, including in September and as late as mid-October 2000 – only several weeks prior to the adverse employment action --, the plaintiff continued to make complaints about the commission calculations, although the defendant may have corrected some of those calculations. DSMF ¶¶ 14, 18; POSMF ¶ 18. In late October, following a meeting at which the parties discussed the medical issues that form the basis for the plaintiff's MHRA claim discussed below, the defendant gave the plaintiff the option of withdrawing from employment with a severance package or taking a six-month leave with the right to reapply for employment. DSMF ¶ 31. The plaintiff did not choose between the two, and the defendant imposed the latter. *Id.,* ¶ 34.

If an employee makes a report to an employer of what the employee has reasonable cause to believe is a violation of law, then the employee engages in a protected activity for purposes of the WBA, provided that the employer is given a reasonable opportunity to correct any such violation or actionable practice. 26 M.R.S.A. § 833. Here, the plaintiff told several of the defendant's supervisory personnel that he believed that the defendant's practices regarding commission payments were unlawful. The law implicated by his accusation includes criminal violations (*e.g.,* 17-A M.R.S.A. § 351 *et seq.*) and civil misconduct (*e.g.,* 26 M.R.S.A. § 621-A *et seq.*). Those practices predated the communication, but the record also supports an argument that they continued even after the plaintiff made the complaint. The record also indicates that in response to the plaintiff's complaints, the defendant sometimes made adjustments to its commission computations. Under these circumstances, the record is adequate to support

a factual argument that the plaintiff had both an actual belief and reasonable cause to believe that the defendant was engaging in unlawful practices by withholding amounts of the commissions to which the plaintiff and perhaps other employees were entitled. The plaintiff's apology of June 27 is a matter that affects the weight of evidence supporting his claim and does not undermine it as a matter of law.

The evidence also generates an argument that the plaintiff's complaint was *a* cause, *see DiCentes*, 1998 ME 227, ¶ 17, 719 A.2d at 515, of the adverse employment action taken against him in October. A factfinder would not be compelled to accept the defendant's explanation for its decision to place the plaintiff on leave. The defendant had a hostile reaction to the plaintiff's complaint and the manner in which he handled the issue. The plaintiff was told that he could find a job elsewhere if he found the commission payment practice unacceptable. Although this remark can be taken as a statement of fact (that is, simply reminding the plaintiff of his options), it also could be construed as a threat. That issue is for the factfinder to resolve. The plaintiff continued to make several more similar complaints, and later that year, he was placed on involuntary leave. Evidence of the pattern of the plaintiff's conduct, the defendant's response to it and the timing of the adverse employment action is sufficient to support an inference that the defendant's employment decision was caused at least in part by the plaintiff's arguably protected conduct. The duration of time surrounding these events and the explanation offered by the defendant do not undermine the existence of a factual argument that the defendant violated the provisions of the WPA.

### B. Maine Human Rights Act (count 2)

The federal burden-shifting analysis applies to claims of employment discrimination under the MHRA, just as it does to WPA actions. *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253, 1261-62 (Me. 1979). Therefore, on his MHRA action, the parties agree that the plaintiff must demonstrate that (1) he was disabled within the meaning of the MHRA, (2) he was qualified to perform the essential functions of his job either with or without a reasonable accommodation for his disability and (3) he was the subject of an adverse employment action because of his disability. With such proof, the defendant bears the burden or producing evidence of a legitimate, non-discriminatory reason for the action it took regarding the plaintiff's employment.

4

Finally, the plaintiff has the ultimate burden of establishing that the proffered explanation is a pretext and that the employer engaged in unlawful discrimination. In its motion, the defendant argues that the record does not reveal a genuine factual argument in support of any of the elements of the plaintiff's prima facie case.

Of the several legal concepts of "physical disability," the plaintiff here predicates his claim on allegations that the defendant "regarded" him as having a physical impairment that substantially limits one or more of his major life activities. *See Winston v. Maine Technical College System*, 631 A.2d 70, 74 (Me. 1993); *see generally* 5 M.R.S.A. § 4553(7-A); *see also* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 9, n.5.

The plaintiff's MHRA claim arises from an episode in August 2000 where he lost consciousness while driving, resulting in a motor vehicle accident. DSMF ¶ 19. The cause of the medical problem is not known. *Id.* ¶ 23. Under state law, the plaintiff then was not permitted to drive for six months from the date of the incident. *Id.*, ¶ 25. The plaintiff's physician did not impose any other restrictions on the plaintiff's activities. *Id.*; POSMF ¶ 26. The defendant was aware of the extent of the restriction imposed by the plaintiff's physician. *Id.*, ¶ 27. It also learned that the plaintiff's condition did not make him eligible under the Family Medical Leave Act because he did not have a serious health condition that would require him to leave work. DSMF ¶ 28; Plaintiff's Statement of Additional Material Fact (PSAMF) ¶ 62.

After his driving privileges were suspended, in order to discharge his work responsibilities, several people drove him around. DSMF ¶ 26. These people included several co-employees and the plaintiff's wife. *Id.* The plaintiff was satisfied that he could continue his sales work by walking, getting rides from other people and using the telephone and facsimile machines. POSMF ¶ 30. The record supports a factual contention that the plaintiff in fact did carry out his work duties in those and other ways, such as by delivery services and drop-offs at the defendant's office. PSAMF ¶ 57.[2]

---

[2] The defendant has denied the plaintiff's assertion in paragraph 57 of his statement of additional material fact. There are two bases for the defendant's denial. The first is the plaintiff's deposition transcript, which does not appear to provide a basis on which to deny this assertion. The second is a bald statement in Lynch's deposition that the plaintiff could not perform his work duties. At the very least, there is consequently a

5

After the defendant learned that the plaintiff's situation did not bring him within the FMLA, the defendant gave him a choice of termination of employment with severance benefits or a six month leave with the right to apply for employment with the defendant. DSMF ¶ 31. The defendant had concluded that it was entitled to present this option to the plaintiff because of the physician's opinion that the plaintiff's condition did not trigger the protections of the FMLA. Defendant's Reply Statement of Material Fact (DRSMF) ¶ 52. The defendant gave the plaintiff this choice because of the six month prohibition against driving. *Id.*; POSMF ¶ 31. When the plaintiff conferred with Pam Lynch the day after the defendant communicated its position to the plaintiff, she said that his job required him to drive and that he was unable to perform his job duties because of the driving restriction. DSMF ¶ 33. Lynch also expressed her belief that "85%" of the plaintiff's job involved driving. *Id.*

The evidence is sufficient to make out an argument that the plaintiff had a physical disability in the legal sense that forms the basis for his MHRA claim. Although no one, including the defendant and even the plaintiff's physician, has provided a medical explanation for the August 2000 blackout, the facts remains that the plaintiff did lose consciousness and the defendant was fully aware of the incident. As a result of the episode, the plaintiff was prohibited from driving for a six month period commencing with the date of the incident. More than a month later, Lynch inquired of the plaintiff's physician if, in effect, the plaintiff suffered from a serious medical condition. She was advised that he did not. Nonetheless, several days later, Lynch sent the plaintiff's physician a form that would help establish if the plaintiff was protected under the FMLA. The physician responded that he did not qualify.

The plaintiff does not argue here that his condition and its effects on him in fact substantially limited one or more of his major life activities. Rather, the plaintiff argues that the defendant treated it as such, regardless of its actual seriousness. The record on summary judgment is sufficient to generate an argument that based on the defendant's perception of the plaintiff's medical condition, the defendant deemed him incapable of performing work responsibilities that involved expectations of independent traveling.

---

genuine issue of material fact on the question of whether the plaintiff adequately performed his job notwithstanding the prohibition against driving.

The defendant argues on this motion that the ability to drive is essential to the plaintiff's employment and that it placed the plaintiff on unpaid leave because he was unable to perform that function. On this record, the plaintiff may legitimately argue that one of his major life activities is his employment in sales. Because the defendant argues that the plaintiff's ability to travel independently is essential to carrying out that life activity, his inability to drive means that, at least from the defendant's perspective, his ability to carry out that life activity is substantially limited. Because, based on the defendant's own argument, the ability and right to drive is a major life activity of marketing, and because the plaintiff's established employment history is in that field, there is a genuine factual issue underlying the plaintiff's fundamental allegation that he was disabled within the meaning of the MHRA.

Next, the evidence generates an argument that the plaintiff was qualified to continue his sales work for the defendant's publication. The record indicates that while the plaintiff was prohibited from driving, he still maintained contact with his clients and continued to transact with them. Therefore, there is a genuine issue of factual dispute regarding whether the right to drive was essential to the plaintiff's employment position. The parties dispute the reasons why the defendant had concerns about any liability exposure that might be created when someone drove the plaintiff to his appointments. However, that is one factual issue that bears on the reasonableness of that possible accommodation, and it cannot be resolved in the context of a motion for summary judgment.

In light of the existence of evidence that the plaintiff was able to perform his job even without driving himself, there is a factual argument that his disability, rather than the driving restriction, was a cause of the adverse employment action.

### C. Unpaid wage claim (count 3)

In count 3, the plaintiff alleges that the defendant is liable to him because it did not make timely payments based on commissions generated by advertising he sold. The record on summary judgment makes clear that the compensation at issue is based on advertising revenues that the defendant received after the plaintiff no longer worked there. DSMF ¶ 38. Those commissions are ordinarily paid to the salesperson when the

7

defendant the customer's payment for the advertising. DSMF ¶ 12.[3] The record also establishes that employees who receive income based in part on commission are not entitled to receive those commission payments if the payment for the advertising is received when the that salesperson is no longer employed by the defendant. DSMF ¶ 37.[4] Therefore, the record on summary judgment does not generate a factual basis on which the plaintiff can argue that he is entitled to the commission payments that form the entire predicate for his unpaid wage claim.

The entry shall be:

For the foregoing reasons, the defendant's motion for summary judgment is granted in part and denied in part. Summary judgment is entered for the defendant on count 3 of the complaint. Beyond this, the motion for summary judgment is denied.

Dated: March 26, 2003

_____
Justice, Maine Superior Court

---

[3] The parties dispute whether the employee remains entitled to a commission when the advertising fee is paid more than 180 days after that payment is due. *See* ¶ DSMF 12; POSMF ¶ 12. That dispute is not material to the circumstances of this case.

[4] In his response to the defendant's factual assertion on this point, he states that he was not aware of that limitation. *See* POSMF ¶¶ 12, 37. Without more, the nature and extent of his subjective understanding of this arrangement is not sufficient to create a genuine issue of material fact regarding the payment policy.

Date Filed __10/9/01__  __Penobscot__  Docket No. ___CV-2001-197___
County

Action __Civil – Damages__

**ASSIGNED TO JUSTICE JEFFREY L. HJELM**

KENNETH E. STONE  vs.  NORTHEAST PUBLISHING CO.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Gilbert & Greif<br>P O Box 2339<br>Bangor ME  04402-2339<br>BY: Arthur Greif, Esq. | EATON PEABODY<br>FLEET CENTER, 80 EXCHANGE STREET<br>P O BOX 1210<br>BANGOR, ME  04402-1210<br>BY:  Glen L. Porter, Esq. |

| Date of Entry | |
|---|---|
| 10/9/01 | Complaint filed.  Exhibit A attached. |
| 10/10/01 | Case File Notice Postcard forwarded to Plaintiff's Counsel. |
| 10/25/01 | Acceptance of Service by Glen L. Porter, Esq on behalf of Northeast Publishing Co. filed. (s.d. 10/23/01) |
| 11/13/01 | Affirmative Defenses and Answer filed. |
| 11/15/01 | Scheduling Order (M.R.Civ.P. 16(a) filed.  The entry will be: Scheduling Order filed.  Discovery deadline is August 1, 2002.  (Hjelm, J.) Copy forwarded to all attorneys of record. |
| 12/4/01 | Plaintiff's Jury Trial Demand filed.  **($300.00 trial fee paid)** |
| 12/13/01 | Notification of Discovery Service filed by Defendant,  1.  Interrogatories to Plaintiff and 2. Request for Production of Documents to Plaintiff. |
| 1/14/02 | Notification of Discovery Service filed by Plaintiff:  Plaintiff's Answers to Interrogatories.  Plaintiff's Responses to Defendant's First Request for Production of Documents. |
| 2/8/02 | Plaintiff's Expert Witness Designation filed. |

Continued
In Mejis

STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-01-197



Kenneth E. Stone,
Plaintiff

v.

Decision and Judgment

Northeast Publishing Co.,
Defendant

On July 30, 2003, a jury returned a verdict finding the defendant liable on the plaintiff's claims of employment discrimination and awarding him compensatory and punitive damages. On September 2, 2003, a hearing was held on the equitable forms of relief sought by the plaintiff. The plaintiff appeared with counsel, and the defendant appeared through counsel. The court has considered the parties' post-hearing memoranda.

First, the court finds that the defendant was actually or constructively discharged from employment in October 2000. The defendant unilaterally placed him on a six month leave of absence and gave him merely the right to reapply for his former job. This is little or no better than the position someone with no connection to the defendant would have had, and it amounts to a separation from employment with no assurance or expectation of renewed employment after the six months had passed.

The plaintiff received employment income from the defendant through October 27, 2000. He does not seek backpay subsequent to October 28, 2002, because as of that latter date he was unable to work due to a medical condition. When the plaintiff's employment earnings for 2000 are projected for the full year, his annualized income would have been $37,500. The court accepts this as the best evidence of the rate of earnings he would have received had he not been terminated from employment in October 2000.

1

The central question raised by the parties relates to the date when the computation of the plaintiff's backpay comes to an end. The plaintiff argues that he is entitled to backpay up to the time when he was medically unable to work, namely, October 28, 2002. The defendant contends that one of several earlier dates marks the terminus of the calculation.

First, the defendant urges that a position became available to him with the defendant when another member of the sales staff, Sandy Violette, left The Weekly (the weekly publication issued by the defendant and for which the plaintiff had worked as an outside sales representative) in February 2001. The defendant argues that the plaintiff could have applied to fill that position and that his failure to do so demonstrates his failure to mitigate his damages. However, the court concludes that the plaintiff acted reasonably in not pursuing further employment from the defendant who, as the jury has established, had illegally discriminated against him. The defendant itself never reached out to the plaintiff to offer him a job, even in the face of his strong sales record and the availability of a position created by Violette's departure. In fact, the defendant never filled that position at all.

The defendant bears the burden of proving that a claim for backpay should be reduced by some sum to account for a plaintiff's actual earnings generated elsewhere during the relevant time frame, or to account for a plaintiff's failure to seek alternative employment income with reasonable diligence. *Maine Human Rights Commission v. Department of Corrections*, 474 A.2d 860, 869 (Me. 1984). When the defendant attempts to prove that the plaintiff failed to exercise reasonable diligence in looking for work, it must prove "that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment. The range of reasonable conduct is broad and the injured plaintiff must be given the benefit of every doubt in assessing her conduct." *Id.* (citation omitted). Under these circumstances at bar, the plaintiff's remedies for backpay do not end when a sales position merely became open in February 2001.

The defendant next argues that the plaintiff's equitable remedy cannot be predicated on backpay that he claims for the period of time after October 2001. In October 2001, the defendant stopped publishing The Weekly. Without missing any

2

issues, however, The Weekly began to be published by the Bangor Publishing Company (BPC) as part of the Thursday editions of the Bangor Daily News. Of the three outside salespeople still working on The Weekly for the defendant in October 2001, two were hired by Bangor Publishing Company to sell advertising for The Weekly, which the company now published. The company had decided not to hire more than two, because more than two salespeople were not needed to cover and generate accounts for The Weekly, and because additional sales personnel would not have justified that extra personnel expense. One of those two people was a sales supervisor, and the other was a salesperson with a strong sales track record. The third salesperson who had worked for The Weekly, whose sales record was not as strong, was not hired by Bangor Publishing Company. Thus, the question arises whether in the absence of the defendant's unlawful termination of the plaintiff, Bangor Publishing Company would have offered the plaintiff a sales position with The Weekly after October 2001. As is noted above, on this issue, the defendant bears the burden of proof. *Department of Corrections*, 474 A.2d at 869; see *also LeBlond v. Sentinel Service*, 635 A.2d 943, 945 (Me. 1993); *Maine Human Rights Commission v. City of Auburn*, 425 A.2d 990, 999 (Me. 1981). Consequently, the plaintiff is entitled to equitable relief based on backpay subsequent to October 2001, unless the defendant proves that Bangor Publishing Company would not have hired the plaintiff. If the defendant fails in its proof on this issue, then the defendant is the liable party.[1] *See Weaver v. Casa de Gallardo, Inc.*, 922 F.2d 1515, 1526 (11th Cir. 1991).[2]

At the September 2 hearing, Wayne Lawton, the advertising director of Bangor Publishing Company, testified that in October 2001, he hired The Weekly's advertising supervisor (John Browning) and one standard salesperson (David Warwick). Browning was attractive as a new BPC employee because of the supervisory position he held at The Weekly. Lawton further testified that he hired Warwick because of Warwick's good sales history and because of his seniority. However, the evidence establishes that in 1999

---

[1] In this case, the defendant does not argue that Bangor Publishing Company would be the responsible party under a theory of successor liability.

[2] Although the defendant challenges the applicability of *Weaver* here, the defendant's director of operations testified that The Weekly's assets were transferred to BPC. This establishes the factual predicate to the legal principle found in *Weaver*'s holding.

3

and perhaps in 2000, the plaintiff's sales exceeded those of the other sales representatives at The Weekly. Further, when asked to address the relative importance of seniority when making his hiring decisions, Lawton testified that sales performance was more important that seniority. This observation makes sense, because a sales record is more probative than longevity of the prospects for sales productivity. Lawton further testified that recent sales performance is more important than more remote data, when the qualities of a salesperson are assessed. Here, the plaintiff had greater recent success in sales for The Weekly compared to Warwick, although Warwick had been more successful in the past.

Inevitably, there is some level of guesswork whenever one is asked to address a hypothetical situation (here, whether BPC *would have* hired the plaintiff in October 2001, *if* the plaintiff had still been in the defendant's employment at that time). However, a critical examination of Lawton's hiring principles raises significant questions about his bald statement that he would not have hired the plaintiff even if the plaintiff worked at The Weekly in fall 2001. When Lawton's hiring criteria are brought to bear on the circumstances that existed then, the plaintiff should and would have been a candidate for employment who was at least as attractive as Warwick. From this, the court concludes that the defendant has not proven that BPC would not have hired the plaintiff in the absence of the defendant's unlawful termination a year earlier.

Next, the defendant contends that the plaintiff's job search slowed down in the beginning of 2002 and that, from that point, it was insufficient to support an award of backpay. The evidence reveals that the plaintiff's job search was more intensive prior to early 2002. *See, e.g.,* plaintiff's exhibit 10 (list of potential employers contacted by the plaintiff). That search went well beyond pure sales positions and included such jobs as cooking and such employers as convenience stores. Additionally, the plaintiff registered with an unemployment service. He earned a small amount of income from one business (the plaintiff agree that those wages would offset his award of backpay), and he turned down one job offer from a printing company because the expenses he would have incurred would have exceeded his prospective income. Although in 2002 the plaintiff ratcheted down the extent of his formal application efforts, he still looked for work. Particularly in light of the vigorous and wide search conducted by the plaintiff through 2001, the court does not find that his efforts between January and August 2002 slowed

down to the point where, based on this record, he missed a job opening that would have resulted in gainful employment.

Finally, the defendant contends that the calculations of the plaintiff's backpay should end in August 2002. That was the time when BPC terminated David Warwick's employment, because it felt that Warwick's sales performance was not adequate. The court views the plaintiff's sales competence as comparable to that of Warwick. Both were valued members of The Weekly's sales staff; Warwick had a long history of superior sales production; when viewed over the long term, Warwick's sales performance was stronger than the plaintiff's; but, in 1999, the plaintiff topped Warwick's and became The Weekly's best producer. Thus, on this record, the court finds no evidence that Warwick was a measurably more preferable member of a publication's sales staff than the plaintiff, or vice versa.[3] Thus, if Warwick's sales record was unacceptable to BPC in August 2002, there is no reason to believe that the plaintiff would have done any better. Additionally, when Warwick was terminated then, another former salesperson with The Weekly lost her job. Thus, the only remaining alumnus of The Weekly's sales staff was Browning, who, because he had been a supervisor and a salesperson, must be seen as having different standing than the plaintiff. The significance of Warwick's departure also must be seen in light of BPC's initial hiring strategy, which was to hire only a limited number of salespeople because of BPC's economic assessment that only a few new employees could be justified financially. Thus, based on Warwick's employment fate, the court finds that the best conclusion allowed by the evidence is that the plaintiff would not have maintained any employment with BPC after August 31, 2002.[4]

---

[3] It is this equipoise that underlies the court's conclusion, discussed earlier in the text, that if the plaintiff has been an employee at The Weekly in October 2001, BPC would have hired Warwick over him. Because of the allocation of the burden of proof, on that issue the court can only find against the defendant.

[4] The evidence indicated that BPC shut down the Summer Street offices where The Weekly had done business, and terminated Warwick, in August 2002. Because the record does not reveal the date in August, and because the defendant bears the burden of proof on issues limiting the plaintiff's damages, the court uses the last day of August as the date when the plaintiff's claim for backpay is deemed to end.

5

The period of time between October 27, 2000, and August 31, 2002, covered 96 weeks. The plaintiff's weekly income, when derived from annual income of $37,500, was $721. His gross backpay claim therefore amounts to $69,216. The defendant is entitled to an offset of $110 for other income earned by the plaintiff during the relevant time period. It is also entitled to the amount it paid to the plaintiff for vacation time that he would not use due to his termination. That amount was $2,077. Thus, the plaintiff is entitled to equitable relief based on lost income in the net amount of $67,029.

The last issue raised by the parties is whether the plaintiff is entitled to pre-suit interest based on his argument that the administrative complaint filed with the Maine Human Rights Commission is tantamount to a notice of claim under 14 M.R.S.A. § 1602.[5] Section 1602 triggers the accrual of pre-judgment interest, even prior to the commencement of an action in court, if the claimant serves a notice of claim, which sets "forth under oath the cause of action. . . ." The notice must be served on the respondent either personally or by registered or certified mail. Here, as part of the process of initiating an administrative action before the MHRC, the plaintiff sent the defendant, by certified mail, a copy of the administrative complaint, the original of which was filed with the MHRC. The complaint identified the cause of action (employment discrimination based on "Failure to Reasonably Accommodate a Disability") and the factual basis supporting that claim. The plaintiff signed the complaint under oath. *See* plaintiff's exhibits A and B. The notice served on the defendant thus includes the elements that are required in a section 1602 notice of claim.

The defendant contends that the administrative complaint should not be treated as a section 1602 notice of claim because the complaint did not refer to section 1602 and

---

[5] The defendant failed to address this issue in its written argument that responded to the plaintiff's memorandum, which clearly did raise the claim for pre-judgment interest discussed in this order. Rather, the defendant addressed the merits of this issue only when it filed a supplemental argument outside of the briefing schedule. Although the defendant notes that it did not view the interest issue as an element of the equitable relief sought by the plaintiff, the purpose of the parties' submissions was to create an opportunity to address those issues that would be included in the court's judgment. The date on which pre-judgment interest begins to accrue certainly can be seen as an issue that a judgment should cover. Thus, there is merit to the plaintiff's argument that the defendant waived its objection to his claim for pre-suit interest. However, because the parties now have addressed the issue fully, the court reaches its merits.

that the defendant thus did not construe the complaint as a mechanism to trigger the accrual of interest under that statute. However, a section 1602 notice is not required to cite that statutory provision, and it is not required to state that it has the effect of commencing the accrual of interest. Thus, the defendant argues that the filing should have included more information, but the controlling provision does not impose that requirement.

Further, more generally, the purpose of a notice of claim is to advise a prospective defendant of the existence of the claim and of the substance of that claim, and the oath requirement is intended to signify the seriousness of the claimant's intention to pursue the claim and to subject that claimant to penalties for any false or inflated statements that are contained in the instrument. *See, e.g., Paradis v. Webber Hospital*, 409 A.2d 672, 675 (Me. 1979) (notice of claim under Maine Health Security Act). Here, the complaint filed by the plaintiff and served on the defendant achieved all of those objectives. Irrespective of whether the defendant was placed on actual notice of the potential consequences of the sworn complaint, the complaint in fact satisfied the necessary and sufficient conditions imposed by section 1602, and nothing about the complaint compromised the effects that it should have had on a party in the defendant's circumstances.

The entry shall be:

Based on the jury's verdict returned on July 30, 2003, judgment is entered for the plaintiff and against the defendant. The plaintiff is awarded compensatory damages for non-pecuniary losses and punitive damages in the combined amount of $ 50,000. *See* 5 M.R.S.A. § 4613(2)(B)(8)(e)(i). In addition to and separate from that award, the plaintiff is awarded $ 67,029 as equitable relief in the form of backpay. The plaintiff is awarded pre-judgment interest, accruing from December 14, 2000, at the annual rate of 6.471%, and he is awarded post-judgment interest at the annual rate of 7.53%. *See* 14 M.R.S.A. §§ 1602-B, 1602-C (eff. July 1, 2003).

The plaintiff is awarded reasonable attorney's fees and costs of court. *See* 5 M.R.S.A. § 4614.

Dated: November 29, 2003

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

7

KENNETH E STONE  - PLAINTIFF

Attorney for: KENNETH E STONE
ARTHUR GREIF
GILBERT & GREIF
82 COLUMBIA ST
PO BOX 2339
BANGOR ME 04402-2339


vs

NORTHEAST PUBLISHING CO - DEFENDANT

Attorney for: NORTHEAST PUBLISHING CO
GLEN L PORTER
EATON PEABODY
80 EXCHANGE ST
PO BOX 1210
BANGOR ME 04402-1210

SUPERIOR COURT
PENOBSCOT, ss.
Docket No   BANSC-CV-2001-00197


**DOCKET RECORD**

Filing Document: COMPLAINT
Filing Date: 10/09/2001

Minor Case Type: CONSTITUTIONAL/CIVIL RIGHTS

## Docket Events:

05/09/2002 FILING DOCUMENT - COMPLAINT FILED ON 10/09/2001

       NOTE - PRIOR ENTRIES IN MANUAL DOCKET ENTERED ON 10/09/2001

05/09/2002 Party(s):  KENNETH E STONE
       ATTORNEY - RETAINED ENTERED ON 10/09/2001
       Plaintiff's Attorney: ARTHUR GREIF

05/09/2002 Party(s):  NORTHEAST PUBLISHING CO
       ATTORNEY - RETAINED ENTERED ON 11/13/2001
       Defendant's Attorney: GLEN L PORTER

05/09/2002 ASSIGNMENT - SINGLE JUDGE/JUSTICE ASSIGNED TO JUSTICE ON 11/15/2001
       JEFFREY L HJELM , JUSTICE

05/22/2002 Party(s):  NORTHEAST PUBLISHING CO
       DISCOVERY FILING - NOTIFICATION DISCOVERY SERVICE FILED ON 05/22/2002
       FILED BY DEFENDANT:  1. NOTICE TO TAKE ORAL DEPOSITION OF KENNETH STONE; NOTICE TO TAKE
       ORAL DEPOSITION OF MARVIN EISENGART, M.D.; 3. NOTICE TO TAKE ORAL DEPOSITION OF HENRY M.
       GLOVER, D.O.

07/11/2002 Party(s):  KENNETH E STONE
       DISCOVERY FILING - NOTIFICATION DISCOVERY SERVICE FILED ON 07/11/2002
       BY PLAINTIFF:  NOTICE TO TAKE DEPOSITION OF PAM LYNCH; NOTICE TO TAKE DEPOSITION OF JOHN
       BROWNING.

07/11/2002 Party(s):  KENNETH E STONE
       DISCOVERY FILING - NOTIFICATION DISCOVERY SERVICE FILED ON 07/11/2002
       BY PLAINTIFF:  REQUEST FOR PRODUCTION OF DOCUMENTS.

07/24/2002 Party(s):  KENNETH E STONE